The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MIRIAM STANPHILL, individually and on behalf of all those similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>　　　　　Defendant. | Case No. C09-0235-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiff's Motion to Remand (Dkt. No. 11), Defendant's Response in Opposition (Dkt. No. 15), and Plaintiff's Reply (Dkt. No. 22). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

I.    BACKGROUND

Plaintiff Miriam Stanphill was a passenger in a vehicle involved in a collision, where the driver of the vehicle, Jacquelyn Groenig, was at fault. (Compl. ¶ 5 (Dkt. No. 1 at 15).) Ms. Groenig was insured by Defendant State Farm Mutual Automotive Insurance Company ("State Farm") and her policy covered both liability and Personal Injury Protection ("PIP"). (*See id.* ¶¶ 6, 10.) As a passenger in Ms. Groenig's vehicle, Plaintiff was covered by the PIP policy and

ORDER
PAGE - 1

she received PIP benefits from State Farm to cover some of her injuries. (*Id.* ¶ 8.) Plaintiff also brought a claim against Ms. Groenig. (*Id.* ¶ 9–10.) State Farm negotiated a settlement to the claim as Ms. Groenig's liability insurer. (*Id.* ¶ 10.) Under the terms of the settlement, Plaintiff was awarded $20,000 plus the amount of the PIP payments she had already received. (*Id.*)

Plaintiff claims that State Farm, as her PIP insurer, is required to pay a *pro rata* share of her legal expenses in obtaining the liability award against Ms. Groenig. (*Id.* ¶ 12.) Plaintiff notes that if Ms. Groenig had used two different insurance companies for PIP and for liability insurance, the insurance company that provided Plaintiff with PIP payments would be reimbursed for those payments once she obtained the total liability award from the other insurance company, and, under Washington state law, the PIP insurer would have to pay a *pro rata* share of Plaintiff's litigation expenses based on the substantial benefit it received from the litigation. *See Mahler v. Szucs*, 957 P.2d 632, 647–48 (Wash. 1998) (deriving this rule from the doctrine of "common fund" fee sharing). Borrowing from the Washington Supreme Court's analysis in *Hamm v. State Farm Mut. Auto. Ins. Co.*, Plaintiff argues that she should not be denied reimbursement for her litigation expenses "simply because [Ms. Groenig] purchased two coverages from the same insurer." 88 P.3d 395, 402 (Wash. 2004). In response, State Farm points to an older case in the state court of appeals that rejected Plaintiff's exact argument, finding that the insurance company was not required to contribute to the litigation expenses because it "did not benefit" from the litigation. *See Young v. Teti*, 16 P.3d 1275, 1277 (2001). However, the Supreme Court rejected similar reasoning in *Hamm*, finding that the offset from one State Farm policy to another still constituted "a benefit to the PIP carrier." 88 P.2d at 399. Therefore, Plaintiff argues that *Young* is no longer good law and that State Farm therefore owes her a *pro rata* share of the litigation expenses. (Compl. ¶ 12 (Dkt. No. 1 at 16).)

On January 20, 2009, Plaintiff brought this class action complaint in state court on behalf of herself and all others similarly situated in Washington State. (*Id.* ¶ 17.) Defendant was served with the Complaint on January 23, 2009, and removed the case to this Court on

ORDER
PAGE - 2

February 23, 2009. (Notice of Removal 1–2 (Dkt. No. 1).) As the basis for removal, Defendant cites diversity jurisdiction under the Class Action Fairness Act ("CAFA"), which requires minimal diversity of citizenship and an amount in controversy in excess of $5,000,000. 28 U.S.C. § 1332(d)(2).

Plaintiff moves to remand the case on two alternative grounds. (Mot. (Dkt. No. 11).) First, Plaintiff argues that Defendant's removal was procedurally defective because it failed to include documents from the state court record, as required by Local Rule CR 101(b). (*Id.* at 3–4.) Second, Plaintiff argues that Defendant has failed to demonstrate that the amount in controversy in this case exceeds the CAFA requirement. (*Id.* at 4–12.) As described below, the Court finds that remand is appropriate on both grounds.

## II. DISCUSSION

Defendant bears the burden of demonstrating that the jurisdictional and procedural requirements for removal have been met. *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 682–83 (9th Cir. 2006). The requirements for removal based on diversity jurisdiction, in particular, are read narrowly, in order to protect state sovereignty and to keep federal courts "'free for their distinctive federal business.'" *Id.* at 685 (*quoting Indianapolis v. Chase Nat. Bank*, 314 U.S. 63, 76 (1941)). The statutory procedures for removal "are to be strictly construed." *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002). There is a "'strong presumption' against removal jurisdiction" and "[f]ederal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).

### A. Procedural Defects in Removal

Under 28 U.S.C. § 1447(b), the district court "may require the removing party to file with its clerk copies of all records and proceedings in [the] State court . . . ." This district has implemented such a requirement under its local rules, which provide that within ten (10) days of filing a notice of removal, the petitioner for removal must "file with the clerk . . . copies of

ORDER
PAGE - 3

1  all additional records and proceedings in the state court, together with his or her counsel's
2  verification that they are true and complete copies of all the records and proceedings in the
3  state court proceedings." Local Rules W.D. Wash. CR 101(b).

4  In this case, Defendant filed its Notice of Removal on February 23, 2009, and attached
5  a certificate of service (Dkt. No. 1 at 10–11), the summons (*id.* at 12–13), the complaint (*id.* at
6  14–21), the order setting civil case schedule (*id.* at 22–27), and the notice of filing of removal
7  (*id.* at 29–31). On March 9, 2009, more than ten days after filing the Notice of Removal,
8  Defendant's counsel filed a Verification of State Court Records. (Dkt. No. 10.) That untimely
9  verification attached a Notice of Appearance that had been left out of the original documents
10 and "certifie[d] that the copies of pleadings and papers . . . that were attached to the Notice of
11 Removal . . . , in addition to the attachment to this verification, are true and correct copies of
12 all the pleadings and other papers filed in the state court action." (*Id.*)

13 Defendant now concedes that the documents it attached to its Notice of Removal and its
14 Verification of State Court Records did not constitute "*all* the pleadings and other papers filed
15 in the state court action"—notably, Defendant did not include the Case Information Cover
16 Sheet that Plaintiff filed in state court. (Resp. 13 (Dkt. No. 15).) Defendant blames this
17 deficiency on Plaintiff, arguing that she should have served Defendant with this document
18 along with other papers. (*Id.*) Defendant, however, provides no support for its claim that
19 Plaintiff was required, or even expected, to serve Defendant with a copy of this document.
20 More importantly, Defendant explicitly verified to the Court that it had attached "*all* the
21 pleadings and other papers *filed* in the state court action" (Verification of State Court Records
22 (Dkt. No. 10 at 1) (emphasis added)), yet it now concedes that it never "actually compare[ed]
23 what [Plaintiff] served with the state court file" (Resp. 13 (Dkt. No. 15)).

24 On March 23, 2009, after Plaintiff had moved to remand in part on the basis of this
25 procedural deficiency, Defendant attempted to cure the error by filing an amended Verification
26 of State Court Records. (Dkt. No. 18.) Defendant cites two older cases for the broad

ORDER
PAGE - 4

proposition that "the failure to file papers required by the removal statute may be remedied." *Usatorres v. Marina Mercante Nicaraguenses, S.A.*, 768 F.2d 1285, 1286 (11th Cir. 1985); *see also Covington v. Indem. Ins. Co.*, 251 F.2d 930, 933 (5th Cir. 1958). Since the 1988 Congressional amendments to 28 U.S.C. § 1447, however, the district courts have generally allowed the removing party to avoid remand for a procedural defect only when the defect is cured within thirty (30) days from the date the action was filed in state court. *See, e.g.*, *Macri v. M & M Contractors, Inc.*, 897 F. Supp. 381, 384 (N.D. Ind. 1995) (noting that remanding within the thirty-day window would be futile because the defendant could simply refile a corrected petition, but holding that "[a]mendments to cure procedural defects after the thirty-day time [removal] limit has passed will not serve to avoid remand."); *Andalusia Enters., Inc. v. Evanston Ins. Co.*, 487 F. Supp. 2d 1290, 1300 (N.D. Ala. 2007) ("The provisions of § 1446(a) would be virtually meaningless if a removing defendant can cure its procedural error at any time before an order of remand is entered."); *Kisor v. Collins*, 338 F. Supp. 2d 1279, 1281 (N.D. Ala. 2004); *Employers-Shopmens Local 516 Pension Trust v. Travelers Cas. & Sur. Co. of Am.*, C05-0444-KI, 2005 WL 1653629, *4 (D. Or. July 6, 2005) ("[A]ny defect in removal procedure must be cured within the 30-day removal period or it is fatal to the removal."). This interpretation of 28 U.S.C. § 1447 is required if statutory removal procedures are to be "strictly construed." *See Durand v. Hartford Life & Accident Ins. Co.*, C07-0614-MSK-CBS, 2007 WL 1395336, *1 (D. Colo. May 9, 2007) ("If strict construction is the command, it is incumbent that the Court apply the statute strictly as written, even—or perhaps particularly—in the face of seemingly inconsequential defects."). Because Defendant admittedly failed to provide the Court with the complete record and proceedings in the state court, as required by 28 U.S.C. § 1447(b) and Local Rule 101(b), and because Defendant failed to cure this procedural defect within the thirty-day removal window, the case should be remanded to the state court.

//

ORDER
PAGE - 5

## B. Amount in Controversy

Even if the Court could overlook the procedural deficiencies in Defendant's removal, it would still find remand appropriate because Defendant has failed to demonstrate that the amount in controversy in this case exceeds $5,000,000, as required by CAFA. "Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met." *Abrego Abrego*, 443 F.3d at 683 ("Under this burden, the defendant must provide evidence that it is 'more likely than not' that the amount in controversy satisfies the federal diversity jurisdictional amount requirement." (internal quotation omitted)).

In this case, Defendant has attempted to prove the amount in controversy through means of statistical approximation. (*See* Linnane Decl. (Dkt. No. 2).) Defendant has identified 5,997 claims over the last six years (the longest statute of limitations for any of Plaintiff's claims) where it paid under the same Washington automobile policy both liability payments for bodily injury ("Liability-BI") and PIP payments. (*Id.* ¶ 9.) Of these 5,997 claims, however, only a fraction will be relevant to the case at hand, because Plaintiff's theory of recovery only applies in cases where the Liability-BI and PIP payments were made *to the same individual*. (*See id.* ¶ 11.) However, rather than review all of the claims to determine which of them fall within the class, Defendant only "reviewed a random sample of 360 of the individual claim files." (*See id.* ¶ 12.) Of these 360 claims, Defendant found that forty-seven fit within Plaintiff's theory of recovery, suggesting that the class comprises about 783 of the 5,997 total claims. (*See id.*) To extrapolate its total liability, Defendant employs the following logic: (1) the forty-seven "class" claims accounted for 20.86% of the total PIP payments in the 360-claim sample it reviewed ($352,405 out of $1,689,411), (2) the sum of PIP payments for *all* 5,997 claims was $35,636,658, so therefore (3) one would expect *all* of the class claims to involve approximately $7,433,677 (20.86% of $35,636,658) in PIP claims. Finally, Defendant suggests that attorneys generally charge one-third of the recovered award; therefore, Defendant

ORDER
PAGE - 6

estimates that, if it had to pay *pro rata* fees for recovering the PIP payments, it would be liable for $2,477,892 (1/3 of $7,433,677). Defendant then uses this estimation as the basis for further approximating the treble damages to which Plaintiff could be entitled and the annual costs that the requested injunctive relief would impose on Defendant moving forward, and it uses these figures to argue that the amount in controversy exceeds $5,000,000. (*See* Notice of Removal ¶¶ 14–15 (Dkt. No. 1 at 5–6).)

      The Court acknowledges that statistical approximation might, in some cases, be sufficient to prove that the amount in controversy more likely than not exceeds the statutory requirement, but, in this case, the Court finds Defendant's analysis troubling and ultimately unpersuasive. Most importantly, Defendant's "random" sample of 360 claims contains two suspicious features, both of which inflate the resulting liability estimate. First, the sum of all PIP payments within the sample is unexpectedly *small*—although the sample contains over 6% (360 / 5997) of the total claims, it accounts for only 4.7% of the total PIP funds ($1,689,411 / $35,636,658). Although one should not expect the percentages for a random selection to match those of the overall population exactly (*see* Mata Decl. ¶ 11 (Dkt. No. 17)), a discrepancy of this size suggests that the sample set might not accurately represent the general population of claims. Second, and more crucially, the class claims (i.e., those with Liability-BI and PIP payments made to the same individual) comprise a relatively *large* percentage of the PIP payments within the sample set reviewed—less than 13.06% (47 / 360) of the claims in the sample set fit within the class definition, but they account for 20.86% ($352,405 / $1,689,411) of the PIP payments in the set. (*See id.* ¶ 12.) Defendant suggests that this significant discrepancy is to be expected because claimants can obtain liability awards on top of their PIP payments only if they hire an attorney to bring a liability claim and, therefore, claimants will only attempt to obtain liability payments if they have sufficient injuries to justify the litigation expenses. (*See* Linnane Decl. ¶ 14 5–6 (Dkt. No. 16).) However, this reasoning only makes sense *if State Farm reimbursed claimants for the pro rata share of litigation expenses resulting*

ORDER
PAGE - 7

*from PIP payments*. State Farm's refusal to pay these expenses—the very policy at the heart of this litigation—actively *discourages* claimants with large PIP payments from bringing Liability-BI claims.[1] This countervailing factor makes it difficult to know whether the high PIP payments among the "class" claims is, as Defendant suggests, a structural feature of the data or whether it is simply further evidence that the sample of 360 claims misrepresents the overall claim population.

These two features of the "random" sample set—higher-than-expected PIP payments for "class" claims, coupled with lower-than-expected PIP payments for the remainder of the claims—are crucially important because Defendant uses the *ratio* of class PIP payments to total PIP payments in the sample set (20.86%) as a critical variable in estimating its total liability. (*See* Linnane Decl. ¶ 12 (Dkt. No. 5).) In so doing, Defendant takes advantage of these deviations in the data to inflate its liability estimate. Indeed, Plaintiff demonstrates that Defendant's own data can be used to produce drastically different results, leading to estimates of litigation expenses as low as $1,224,612, *less than half* of Defendant's estimate. (Mot. 6–7 (Dkt. No. 11).) Defendant argues that these alternative calculations are less statistically rigorous that its own (*see* Mata Decl. ¶ 13 (Dkt. No. 17 at 5)); however, the simple fact that reasonable alternative analyses can produce such differing results suggests that there is something fundamentally problematic about Defendant's sample set.

---

[1] For example, consider an injured claimant who obtains $25,000 in PIP payments but would be entitled to a $30,000 Liability-BI award. State Farm would view this as a $5,000 payment on top of the existing PIP payments and so would refuse to contribute to the litigation expenses. But according to Defendant's model, an attorney would charge $10,000 (1/3 of $30,000) to pursue the liability claim. In this scenario, Defendant would be made *worse off* by bringing the additional liability claim and therefore would presumably forego such action.

On the other hand, if the same claimant had originally received only $15,000 in PIP payments, the $10,000 expense in bringing a liability claim might be justified because the claimant could recover an additional $15,000.

In this manner, State Farm's policy of refusing to pay its *pro rata* share of claimants' legal expenses discourages those with high PIP payments from bringing liability claims.

ORDER
PAGE - 8

Accordingly, the Court gives little weight to Defendant's statistical estimate of the total litigation expenses for which it could be held liable. Moreover, unfortunately for Defendant, this liability estimate underlies most of the other calculations that make up its estimated amount in controversy.[2] (*See, e.g.*, Linnane Decl. ¶ 13 (Dkt. No. 2) (computing the estimated annual cost of complying with injunctive relief in the future as one-sixth of the liability estimate, or $412,989); Notice of Removal ¶ 14 (Dkt. No. 1 at 5) (estimating treble damages as three times the liability estimate, or $7,433,808); Mata Decl. ¶¶ 14–16 (refining its treble damages calculation down to $4,554,365 using data from same subsample of 360 claims used to compute the liability estimate).) Given the Court's skepticism regarding Defendant's estimate of its basic liability, the Court finds that these derivative estimates are entitled to even less weight.

In light of the problems with Defendant's statistical analysis, the Court cannot say whether the amount in controversy in this case exceeds $5,000,000. It may, but it very well may not, and the Court finds that Defendant has failed to meet its burden of proving by a preponderance of the evidence that the amount in controversy exceeds the statutory requirement. *See Abrego Abrego*, 443 F.3d at 682–83.

//

//

//

---

[2] The only component of Defendant's estimated amount in controversy that is *not* based on the questionable liability estimate is Defendant's estimated statutory attorney fees. In the Notice of Removal, Defendant states only that "Ms. Stanphill's attorney has been plaintiff's counsel of record in at least two class actions in the Western District of Washington where class counsel's claimed lodestar ranged from approximately $950,000 to $1,250,000." (Notice of Removal 5 (Dkt. No. 1).) Other than the fact that these cases were both class actions litigated by the same attorney, Defendant provides no evidence whatsoever to suggest that those cases are relevant to predicting the expected attorney fees in this case. (*See* Mot. 9–10 (Dkt. No. 11).)

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Remand (Dkt. No. 11) is GRANTED.

DATED this 26th day of June, 2009.

                                               *[signature]*

                                               John C. Coughenour
                                               United States District Judge

ORDER
PAGE - 10